RANDALL & BLAKE, INC., Plaintiff–Appellant,

v.

METRO WASTEWATER RECLAMATION DISTRICT, a political subdivision of the State of Colorado, Defendant–Appellee.

No. 02CA0884.

Colorado Court of Appeals, Div. I.

March 27, 2003.

Certiorari Denied Oct. 6, 2003.

Stettner, Miller & Cohn, P.C., John S. Finn, Denver, Colorado, for Plaintiff–Appellant.

Inman, Flynn & Biesterfeld, P.C., Joel A. Moritz, Robert J. Thomas, Denver, Colorado, for Defendant–Appellee.

Opinion by Judge GRAHAM.

Plaintiff, Randall & Blake, Inc. (RBI), appeals the summary judgment in favor of defendant, Metro Wastewater Reclamation District (Metro). We reverse and remand for further proceedings in accordance with this opinion.

The parties stipulated to the following facts. Metro, a political subdivision of the State of Colorado, and RBI, a Colorado corporation, entered into an agreement for the construction of the P.A.R. 734 South Platte River Segment 15 Phase II Improvements Project. Metro also retained Camp Dresser & McKee, Inc. (CDM) as the engineer for the project.

Metro accepted sealed bids on the project. RBI bid a total base contract price of $2,742,222. Included in that amount was RBI's lump sum bid of $1,409,528 for the construction of a new reaeration structure (RS3).

A portion of the work on the entire project required the placement of boulders, riprap, and filter gravel at specific locations, including the RS3 site. The materials were required to be placed on filter bedding having certain qualities specified in the contract.

After the necessary portion of the river was drained, CDM conducted a gradation test, pursuant to the contract specifications, and determined that the materials from the

river bottom complied with the contract specifications for filter bedding. These materials are referred to as type II bedding material.

During construction, RBI completed all work required under the contract, which included furnishing "all labor, materials, equipment, and incidentals to place rock boulders, riprap revetments and blankets, and appurtenances as shown on the Drawings and as specified herein." The complying type II bedding material discovered at the project site was used as bedding for the riprap in the river and on the banks throughout the project, including RS3. No other type II bedding material was imported by RBI.

By April 2000, the work involving the type II bedding material had been completed. The parties thereafter began to discuss a possible change in the contract price. CDM attempted to calculate a change in the contract price based upon a unit price for type II bedding material. CDM suggested that a quantity change in type II bedding material—resulting from the use of on-site bedding material—justified a unit price reduction and, consequently, a contract price change. The parties failed to reach an agreement on any change to the contract price.

In January 2001, CDM and Metro issued two change orders to the contract. The first purported to delete the "type II bedding material as part of the foundation for [RS3]." The second changed the contract price based upon the cost savings afforded by not having to purchase and supply the bedding material. CDM's calculation was based in part on unit cost savings of the bedding material. The contract price was reduced by $101,384 in Metro's favor.

Metro accepted all remaining work on the project, and RBI filed suit against Metro, seeking the balance of the contract price of $101,384, plus interest. The parties filed cross-motions for summary judgment.

Although the parties agreed that the portion of the contract regarding the construction of RS3 used a "lump sum" price provision, the trial court determined "that the contract at issue was a unit price and not a lump sum contract." The trial court ruled that the type II bedding material was bid on a unit price basis and that the contract price should be adjusted to reflect that the estimate of type II bedding material differed materially from that which RBI had to supply. This appeal followed.

## I.

We review a summary judgment de novo, applying the same standards that govern the trial court's determination. Where, as here, the facts are undisputed, the sole issue is whether the moving party was entitled to judgment as a matter of law. *State Farm Mut. Auto. Ins. Co. v. Kastner*, 56 P.3d 1144 (Colo.App.2002).

The interpretation of a contract is a question of law for the court. *Roemmich v. Lutheran Hosps. & Homes Soc'y*, 934 P.2d 873 (Colo.App.1996). A court's duty is to interpret a contract in a manner that effectuates the manifest intention of the parties at the time the contract was signed. *Main Elec., Ltd. v. Printz Servs. Corp.*, 980 P.2d 522 (Colo.1999); *Roemmich v. Lutheran Hosps. & Homes Soc'y, supra*. "The touchstone in determining the intention of the parties is the language of the written agreement." *Roemmich v. Lutheran Hosps. & Homes Soc'y, supra*, 934 P.2d at 875.

If the language is plain, clear, and unambiguous, a contract must be enforced as written. *Christmas v. Cooley*, 158 Colo. 297, 406 P.2d 333 (1965). In addition, the words and phrases in the contract should be interpreted, not in isolation, but by examination of the contract as a whole. Finally, documents executed together as part of a single transaction should be considered together in ascertaining the intent of the parties. *Roemmich v. Lutheran Hosps. & Homes Soc'y, supra*.

Courts possess no authority to rewrite contracts and must enforce unambiguous contracts in accordance with their terms. *Radiology Prof'l Corp. v. Trinidad Area Health Ass'n*, 195 Colo. 253, 577 P.2d 748 (1978).

## II.

We first address whether the trial court erred in finding that the contract at issue is a

unit price and not a lump sum contract. We conclude that the trial court so erred.

The trial court determined that the contract here is identical to the contract in *Platte Valley Ditch & Reservoir Co. v. H.C. Lallier Constr. & Eng'g Co.*, 91 Colo. 317, 14 P.2d 1079 (1932), and therefore, the outcome should be the same. In *Platte Valley Ditch,* a contractor built a diversion dam across the South Platte River and sued to collect the balance due under the contract. After reviewing schedules to the contract, the court determined that it was a unit price contract, which required that the contractor be paid for the added cost of steel sheet piling needed to build the dam on bedrock. There was testimony in *Platte Valley Ditch* that the engineer who drafted the contract intended it to be a unit price contract, and schedules and specifications convinced the court that it was such a contract.

Here, the trial court's reliance on *Platte Valley Ditch* is misplaced because the actual specifications and schedules in *Platte Valley Ditch* were not part of that case, and the particulars were not discussed in detail. There is therefore no basis for concluding that the contract terms here are "identical" to the contract terms in *Platte Valley Ditch.*

■ The contract here plainly includes both unit price and lump sum provisions, which are applied to different facets of the project. However, the parties agree, and the contract plainly states, that the RS3 work was to be performed on a lump sum basis: the bid form specifies that RS3 shall be bid on a "lump sum" basis; RBI bid a lump sum price of $1,409,528 for RS3 work; and the specifications state that the "measurement and payment for [RS3] shall be on a lump sum basis." This lump sum price includes full compensation for all costs associated with the construction of RS3.

Thus, the unambiguous contract language and the parties' stated understanding clearly support the determination that this is a lump sum contract. The trial court's construction and interpretation of the contract is therefore incorrect. *See Radiology Prof'l Corp. v. Trinidad Area Health Ass'n, supra.*

## III.

RBI contends that because the work was bid on a lump sum basis, the trial court erred as a matter of law in finding that Metro was entitled to a credit for a deletion of work by change order related to the construction of RS3 and a corresponding price change based upon the use of on-site excavated material in lieu of imported type II bedding material. We agree.

Metro concedes that the RS3 contract provision was negotiated on a lump sum basis, but argues that whether the contract is viewed as a lump sum or unit price contract is irrelevant. According to Metro, RBI's use of the type II bedding material found at the site entitled Metro to delete a portion of the specified work in either case, and it was therefore entitled to the resulting credit. The contract documents and the facts in the record do not support Metro's arguments.

■ Under the express terms of the contract here, a change order could result in an adjustment to the lump sum contract price. A change order is signed by the owner and "authorizes an addition, deletion, or revision in the Work, or an adjustment in the Contract Price or the Contract Times, and issues on or after the Effective Date of the Agreement." "Work" is defined as:

> The entire completed construction of the various separately identifiable parts thereof required to be furnished under the Contract Documents. Work includes and is the result of performing or furnishing labor and furnishing and incorporating materials and equipment into the construction, and performing or furnishing services and furnishing documents, all as required by the Contract Documents.

Under the RS3 portion of the project, RBI was required to place grouted boulders and riprap in the river channel and on the river banks. The riprap had to be placed onto type II bedding material consisting of gravel or crushed stone meeting certain specified gradation requirements. Contrary to the trial court's conclusion and Metro's suggestion, there is no separate requirement in the contract that type II bedding material be imported or purchased.

Paragraph 3.2(A) of the "Boulders, Riprap, and Filter Gravel" section directs the contractor to "[e]xpose and test gradation of subgrade where rock is to be placed and "[s]ubmit gradation tests of subgrade materials and review subgrade conditions in the field with the Engineer." Paragraph 3.8(C) further requires that "[s]uitable excavated material ... shall be used for fill embankments or backfill on the different parts of the work as required and as acceptable to the Engineer." There is no provision that a credit be issued to Metro if excavated materials are used.

Further, if paragraph 3.8(c) were intended to serve as a basis for price reduction as Metro suggests, a cost adjustment provision should have been included.

Here, it is undisputed that RBI completed all work required under the "Boulders, Riprap and Filter Gravel" section of the specifications. The complying type II bedding material discovered at the project site was used in lieu of importing other material. Accordingly, Metro received exactly what it bargained for: placement of type II bedding material under the riprap. There was no deletion of work. Thus, a change order for the deletion of type II bedding material should not have been issued. Under this lump sum arrangement, RBI's bargain was that it could complete the work and supply the materials for less than the contract price, and its risk was that it would be subject to the vagaries of the market, perhaps having to supply materials and labor at a cost greater than it had estimated.

Furthermore, at no time during the construction of RS3 was RBI notified by a change order that the work should be deleted. A change in the work must be made by a written amendment to the contract through issuance of a written change order:

Any claim for an adjustment in the Contract Price shall be based on written notice delivered by the party making the claim to the other party and to ENGINEER promptly (but in no event later than thirty days) after the start of the occurrence or event giving rise to the claim and stating the general nature of the claim. Notice of the amount of the claim with supporting data shall be delivered ... and shall be accompanied by claimant's written statement that the adjustment claimed covers all known amounts to which the claimant is entitled as a result of said occurrence or event. All claims for adjustment in the Contract Price shall be determined by ENGINEER ... if OWNER and CONTRACTOR cannot otherwise agree on the amount involved. No claim for an adjustment in the Contract Price will be valid if not submitted in accordance with this paragraph....

This provision clearly contemplates that change orders be issued before completion of work so that the contractor can adjust its work and comply with the change.

### IV.

Metro argues that this notice provision was waived when the parties began to negotiate a change to the contract price. We conclude that further proceedings are required to determine whether the parties, by their conduct, modified the contract price, thereby precluding RBI from recovering a sum inconsistent with that modified price.

The record suggests that Metro attempted to use an after-the-fact deletion of work change order to substitute for a unit price adjustment to which it was not entitled. RBI's response, however, was to begin negotiation of a change to the contract price while concomitantly rejecting the notion that work could be deleted. Based upon the correspondence in the record, it appears that the parties may have intended to modify the price term. However, there has been no resolution of the facts concerning that attempt.

If the parties intended to modify the price term, they were free to do so, providing that there was consideration for the modification.

Thus, questions remain concerning whether the parties may have agreed to adjust the lump sum price and the extent to which an adjustment to the lump sum price was effected under the applicable contract terms. In these circumstances, summary judgement may not enter.

The judgment is reversed, and the case is remanded for further proceedings in accordance with this opinion.

Judge VOGT and Judge STERNBERG * concur.